IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>           v.<br><br>JOEL JEROME TUCKER,<br>[DOB: 12/02/1968]<br><br>                      Defendant. | No. _____<br><br>**COUNTS ONE through TWELVE:**<br>18 U.S.C. § 2314<br>*(Interstate Transportation of Stolen Money)*<br>NMT 10 Years Imprisonment<br>NMT $250,000 Fine<br>NMT 3 Years Supervised Release<br>Class C Felony<br><br>**COUNTS THIRTEEN and FOURTEEN:**<br>18 U.S.C. § 157<br>*(Bankruptcy Fraud)*<br>NMT 5 Years;<br>NMT $250,000 Fine<br>NMT 3 Years Supervised Release<br>Class C Felony<br><br>**COUNT FIFTEEN:**<br>18 U.S.C. §§ 1519 and 2<br>*(Falsification of Record in Bankruptcy)*<br>NMT 20 Years Imprisonment<br>NMT $250,000 Fine<br>NMT 3 Years Supervised Release<br>Class C Felony<br><br>**FORFEITURE ALLEGATION:**<br>18 U.S.C. §§ 982(a)(1) and (a)(2)(A)<br><br>$100 Mandatory Special Assessment Each Count<br><br>Order of Restitution |

## I N D I C T M E N T

THE GRAND JURY CHARGES THAT:

At all times material and relevant to this Indictment:

### Introduction and Background

1.    Defendant Joel Jerome Tucker was a resident of Johnson County, Kansas, and owned businesses in Missouri, Kansas, Colorado, and Wyoming.

2.     Beginning in at least 2002 and continuing through 2012, Joel Tucker, working through various companies, serviced payday loan businesses.  Tucker's company names changed over the years; the primary company would become eData Solutions, LLC (eData).  eData, formally registered on July 29, 2009, did not make loans directly to borrowers; it collected loan application information, referred to as leads, and sold those leads to its approximately 70 payday lender clients.  As a loan servicer, eData also provided software for payday lenders.

3.     From 2014 to 2016, Joel Tucker, operating under multiple businesses and business bank accounts, engaged in two related schemes to defraud:  a sale of fake debt scheme and a bankruptcy fraud scheme.  In the sale of fake debt scheme, Tucker defrauded third party debt collectors and millions of individuals listed as debtors through the sale of falsified debt portfolios.  These portfolios were false in that Tucker did not have chain of title to the debt, the loans were not necessarily true debts, and the dates, amounts, and lenders were inaccurate and in some cases fictional.  In his bankruptcy fraud scheme, Tucker also sold fake debt, which entered the United States Bankruptcy Courts nationwide, and then made false statements and presented false information to the Bankruptcy Court and violated court orders to conceal his sales of fake debt.

4.     Tucker used the companies Alloy Data Systems, Graywave Capital Management LLC (Graywave), HPD LLC, JT Holdings Inc., KSQ Management LLC (KSQ), and SQ Capital LLC to sell the debt.  Tucker sometimes sold the debt through debt brokers or other intermediaries.

5.     On May 7, 2010, SQ Capital, LLC was organized as a Missouri company.  On November 17, 2011, Tucker opened a business bank account in the name SQ Capital LLC at Bank of the West, account number ending 7505.  Tucker was the sole authorized signer on the account and listed himself as the president of SQ Capital LLC.

6.      On November 17, 2011, Tucker opened a business bank account in the name KSQ Management, LLC at Bank of the West, account number ending 2331.  Tucker was identified as the president and was the sole authorized signer on the account.

7.      On September 6, 2012, Tucker opened a business bank account in the name Graywave Capital, at Bank of the West, account number ending 7027.  Tucker identified himself as the president, sole owner, and principal manager of Graywave Capital, and was one of two authorized signatures on the account.  On December 16, 2014, Tucker opened a business bank account in the name Graywave Capital Management LLC at Centennial Bank, account number ending 8349.  Tucker was one of two authorized signatures on the account.

8.      On January 30, 2014, one of Tucker's colleagues opened a business bank account in the name Alloy Data Systems LLC at Bank of the West, account number ending 1738.

9.      On February 5, 2016, SafeLock PC LLC, a company formed under Wyoming laws, was registered to do business in Missouri.  Tucker identified himself as CEO of SafeLock, solicited investments on behalf of SafeLock, and signed a commercial lease for office space in Kansas City, Missouri, on behalf of SafeLock as a partner.

10.     For tax years 2014 - 2016, neither Tucker personally nor any of his companies filed federal tax returns with the Internal Revenue Service, including:

   a.      Graywave Capital Management
   b.      HPD LLC
   c.      JT Holdings Inc.
   d.      KSQ Management LLC
   e.      SQ Capital LLC

## PURPOSE OF THE SCHEMES TO DEFRAUD

11.    Between 2014 and continuing into 2016, Tucker executed a fake debt scheme by marketing, distributing, and selling fake debt portfolios that purported to represent valid due and owing payday loans made by a variety of purported lenders, including "500FastCash" and "Castle Peak." Tucker sold supposed debts which: 1) he didn't own; 2) were not true debts; 3) had already been sold to other buyers; and 4) contained false lenders, false loan dates, false loan amounts, and false payment status. Tucker received approximately $7.3 million from the sale of fake debt. The purpose of Tucker's scheme was to fraudulently obtain money for his own use and gain. As part of his fraud scheme, Tucker transferred the proceeds of the fraud scheme across state lines, as delineated below in Counts One – Twelve.

12.    In 2015, Tucker executed a related bankruptcy fraud scheme in which he marketed, distributed, and sold fake debt portfolios though a debt broker to bankruptcy debt collectors. Tucker sold supposed debts which: 1) he didn't own; 2) were not true debts; 3) had already been sold to other buyers; and 4) contained a false lender name, false loan dates, false loan amounts, and false payment status, for his financial use and gain. When the United States Bankruptcy Court investigated these fake debts which were presented as claims in bankruptcy cases, Tucker provided false information and testimony to the Bankruptcy Court in order to conceal his scheme.

## SALE OF FAKE DEBT SCHEME

13.    On August 1, 2012, President Obama signed a law referred to as Operation Chokepoint, which resulted in banks refusing to make Automated Clearinghouse withdrawals from their customers' bank accounts associated with payday lenders, which greatly reduced the profitability of payday loans. Many payday lenders went out of business after Operation Chokepoint.

14.     On June 20, 2012, Tucker and the other owners of eData sold the company to the Wyandotte Indian tribe. By the terms of the sale agreement, Tucker did not retain ownership or chain of title to any payday loans made by eData's clients.

15.     However, despite selling his interest in eData, Tucker maintained a file of 7.8 million leads ('7.8 file') he had acquired through eData, containing detailed customer information including names, addresses, bank accounts, social security numbers, dates of birth, etc. Tucker's company eData sold the detailed customer information from online payday loan applications or inquiries to its payday lender clients. The 7.8 file did not represent loans, as loans would have been made by the various payday lenders. The 7.8 file contained listed customers, some of whom withdrew their requests for loans, some of whom were denied loans, some of whom obtained loans and repaid them, and some of whom obtained loans and defaulted in the payments.

16.     Notwithstanding that the 7.8 file did not represent loans, much less defaulted loans, and notwithstanding that Tucker did not own the loans, he proceeded to package, market, and sell this information as collectible debt to multiple debt buyers through 2014 and 2015. Tucker had the 7.8 file broken into subparts to package, market, and sell.

17.     Tucker, for the purpose of executing the scheme to defraud, often used intermediaries and debt brokers to recruit debt buyers by presenting to potential buyers that he owned the debt he was marketing, that it was legitimate debt and/or that it had not been sold to other debt buyers. Tucker well knew that the representations to be made by the debt brokers and intermediaries were false at the time they were made. Tucker used intermediaries in part to distance himself from and conceal his role in the scheme to defraud.

18.     On or about July 22, 2014, Tucker created a fake contract between seller Black Creek LLC, supposedly representing 500FastCash, and buyer SQ Capital LLC, Tucker's

company.  The contract purported to sell charged-off payday loan accounts from Black Creek LLC to SQ Capital LLC, with an unpaid balance due of $94,999,140, for $1,274,984.18.  Black Creek LLC did not own 500FastCash loans.  500FastCash and related payday lenders such as Ameriloan, AdvantageCashServices, AceCashServices, etc., were associated with Tucker's brother Scott Tucker and serviced by AMG Services, Inc.  Tucker created and used this fake Black Creek LLC contract to make it appear as though he owned the payday loan debt.

19.     Through SQ Capital and other companies, Tucker sold payday loan debt he did not own to multiple entities, including:  debt broker United Debt Holdings; STP Management Group; Delray Capital, LLC; Bayview Solutions, LLC; Solutions Software, CHM Capital Group LLC; Aura Development, Inc.; Ashton Asset Management; and others.

20.     Tucker, either directly or through a debt broker, represented that he owned the debt. Tucker sold the debt in the form of spreadsheets created from his 7.8 file.  The spreadsheets, also called debt portfolios, contained customer names, dates of birth, addresses, phone numbers, bank accounts, email addresses, employers, and references.  Most of this information was accurate and allowed the debt purchasers to contact the customers and attempt to collect the debt.  Thus, Tucker placed in the hands of debt collectors the means through which they could mislead customers regarding their debt obligations.  Some customers actually paid the debt collectors out of fear or confusion about what they owed.

21.     The spreadsheets Tucker sold to debt purchasers also contained loan information. The loan information was often false, listing false lenders, false loan amounts, false past due amounts, and false loan dates.

22.     Tucker sold the same sets of debts to multiple purchasers, materially failing to disclose to purchasers that he had previously sold the same debt.

23.     Beginning in September 2014, AMG sent cease and desist letters to debt buyers such as Delaware Solutions and Clear Credit Solutions, who had bought fake debt from Tucker or his intermediaries, and then attempted to collect from customers and non-customers alike, for purported payday loan debt serviced by AMG.  Notwithstanding the cease and desist letters, Tucker continued to sell payday loan debt he did not own through late 2014 and all of 2015.

24.     On December 16, 2016, the Federal Trade Commission (FTC) filed a civil suit against Tucker and three of his companies, SQ Capital, LLC, JT Holdings, Inc., and HPD LLC, in the District of Kansas, case number 16-CV-02816, for misleading consumers through his sale of fake debt.  Tucker represented himself in this lawsuit, and on or about March 15, 2017, he emailed the FTC an accounting of his ownership of the payday loan debt, stating, "I do not have the chain of title in my possession.  The Wyandotte Indian Tribe has it held their records.  I do not have any rights to the chain of title for any transactions with SQ Capital, JT Holdings, or HPD."

## BANKRUPTCY FRAUD SCHEME

25.     In 2015, Tucker sold fake debt portfolios to First Source Data (FSD), owned by Jeffrey Brooks, a debt broker.  FSD brokered the debt to Porania LLC, a bankruptcy debt purchaser.  A bankruptcy debt purchaser specializes in buying debt in which the debtors have filed for bankruptcy.  The debt purchaser then files claims in Bankruptcy Chapter 7 and Chapter 13 cases throughout the country.  Through this business model, bankruptcy debt purchasers collect a portion of the debts when the bankruptcy trustees sell assets or collect payments from debtors.

26.     Tucker caused to be created the debt portfolios he sold using his 7.8 file of payday loan leads.  He did not have title to the debt he sold to FSD.  He provided two debt portfolios (spreadsheets), the first named "JB 11-18-2015_Revised1.xlsx" that listed 8,775 debtors who had filed for bankruptcy, including the district of their bankruptcy and the name of the bankruptcy

trustee. The second spreadsheet, named "FSD 12-10-2015.xls," listed 5,628 debtors who had filed for bankruptcy. Approximately seventy of the listed debtors in the two spreadsheets were in bankruptcy in the Western District of Missouri. The spreadsheets contained false information, including that the listed consumer had received a loan, was in default on the loan, and the dates of the loans. Tucker caused to be listed the lender of all the debt he sold to FSD as "Castle Peak." This was fictional; Castle Peak was not a payday lender or servicer. Tucker caused to be listed the loan amount for each debtor as $300, and the financing charge as $90; he thus represented each debtor owed $390. These amounts were also fictional.

27. Tucker sold the above-mentioned spreadsheets to FSD in two installments, the first for $30,000 on November 27, 2015, the second for $12,500 on December 16, 2015. In connection with the debt sale, on December 11, 2015, Tucker provided "sample media" to FSD, which FSD in turn provided to Porania. The sample media, approximately ten loan origination notes, like the debt, was fictional. On all notes, the lender was represented to be Castle Peak, the loan amount was $300, the financing charge was $90, and the customer signatures were forged.

28. Through FSD, Porania bought Tucker's fake debt, and sold some to Atlas Acquisitions LLC, another bankruptcy purchaser, in December 2015. When Porania and Atlas bought the debt, they filed claims in over a thousand pending bankruptcy cases throughout the country, including in the Western District of Missouri.

29. In early 2016, bankruptcy trustees throughout the country disputed filed claims on the "Castle Peak" payday loans in the amount owing of $390. On January 11, 2016, Brooks, as FSD, forwarded an email he had received to Tucker which stated, "Jeff – can you please mark this as "urgent". We have several Trustees inquiring about these accounts." Brooks added to the

forwarded email, addressing Tucker, "You have the other media requests as well correct?" Also on January 11, 2016, Tucker responded to Brooks, "I am trying my best to get them."

30. On February 5, 2016, the Honorable Marvin Isgur, a United States Bankruptcy Judge in Houston, Texas, the Southern District of Texas, opened a Miscellaneous Case, No. 16-302, to investigate the source of over a thousand proofs of $390 "Castle Peak" claims filed in bankruptcy courts across the United States, specifically referencing 26 claims pending in the Southern District of Texas.

31. Judge Isgur found that Tucker or an entity controlled by him transferred the $390 claims to debt collectors. On March 3, 2016, Judge Isgur ordered Tucker to appear as a witness in the bankruptcy court on March 21, 2016, and to produce documents regarding the filing of proofs of claim.

32. On March 19, 2016, Tucker received an email from a colleague referring to the 26 claims in Judge Isgur's order, which stated, "Attached is the new spreadsheet of the 18 SSN's and the information found in the eData tables. If they were found in the iCollect table, that information is also exported. You will see duplicate customers but in different funding companies. Many were not funded and were either withdrawn or denied but I pulled all the app data for them."

33. Tucker appeared before Judge Isgur in Houston on April 4, 2016, but produced no documents. Tucker testified, "it's taking me more time to go back and go through all those pieces of documentation and also find the media attached with those files." Judge Isgur ordered Tucker taken into custody, but Tucker claimed he could only produce the documents by travelling to Kansas City and Colorado. Judge Isgur released Tucker on the condition he produce the ordered documents and that Tucker notify the trustee and parties before accessing any documents in Kansas City or Colorado.

34.     Tucker violated Judge Isgur's order in that he accessed and caused to be accessed, documents in Kansas City, Missouri, without giving notice to the trustee or parties.  Specifically, on April 9, 2016, Tucker caused another person to access a spreadsheet called "icollectmasterfull.xlsx" which was then downloaded to Tucker's virtual server.  Further, on April 11, 2016, Tucker caused another person to access spreadsheets "File1_JT.xlsx," "File2_JT.xlsx," "File3_JT.xlsx," "File4_JT.xlsx."   These spreadsheets all related to the bankruptcy debt Tucker sold to FSD.

35.     On April 14, 2016, a paralegal for the bankruptcy trustee accompanied Tucker to the office at SafeLock in Kansas City, Missouri, and videotaped Tucker accessing spreadsheets on a virtual server.  Tucker stated in the video, "All right, that's it, this is the biggest one," after accessing a spreadsheet.  This statement was false, as Tucker could have accessed more documents, including the 7.8 file, but chose to exclude the 7.8 file from his virtual server.  Tucker's data was on a virtual server, which he could have retrieved from anywhere, including Houston.

36.     In Kansas City, Missouri, Tucker caused to be created a spreadsheet responsive to Judge Isgur's order that he provide loan documentation for 26 debtors in the Southern District of Texas.  On April 28, 2016, Tucker presented to the court a spreadsheet labeled "Tucker027983" which contained false information, including a loan amount of $300 for all debtors, a total balance due of $390 for all debtors, and the lender, which he listed as "Castle Peak" for two debtors.  On March 24, 2016, Tucker had received an email from a colleague informing him that at least 8 of the 26 debtors had no loan information.  Tucker nevertheless presented to the court loan information on the spreadsheet as though all 26 debtors had received loans and defaulted.

37.     At the hearing on April 28, 2016, Tucker testified before Judge Isgur.  Some of his false statements, identified by transcript page number, include:

a.	Q:  "during your review of the electronic data in Kansas City, did you find any additional information relating to the 24 claims between  - - that Mr. Brooks and First Source sold to Porania?"  Tucker:  "No."  Page 45.

b.	Q:  "Where did these (sample loan documents) come from?"  Tucker:  "These are generated through the loan management software system Judge."  Q:  "That who owns?"  Tucker: "That I do."  Page 80.

c.	Tucker:  "Castle Peak was a client of ours and we knew that that loan note was the one they used, yeah."  Page 81.

d.	Q:  "So you thought all of these people had borrowed $300 from Castle Peak?" Tucker:  "Right."   Page 83.

e.	Q:  "So, Mr. Tucker, when did you reclaim ownership of the 2,000,000 debt files or claims?"  Tucker:  "April of - - April 5th of 2014."  Page 109.

f.	Tucker:  "I mean I believe Castle Peak was one of the issuers."  Pages 116-17.

g.	Tucker:  "Yeah, Castle Peak was one - - the issuer.  Yes, one of the issuers, yes." Page 140.

h.	Q:  "At the time that First Source sold the claims that you transferred to First Source to Porania, you thought that Castle Peak was the sole issuer of those claims; is that correct?" Tucker:  "One of the issuers, yes.  The sole issuer, yes."  Page 142.

i.	Q:   "why did you email Mr. Brooks with the Castle Peak information?" Tucker:  "Well, that was one of the lenders.  That's a lender."  Page 166.

j.	Q:  "But in this email on January 11th you're telling him you're "trying my best to get them." " (loan origination documents)  Tucker:  "Because he kept - - he kept saying, hey, what

about this, what about this, can we get this, can we get this. It was like, I'm trying my best, man; I told you there's no underlying data, there's no underlying media." Page 172.

38.    After the April 28 hearing, Judge Isgur found that Tucker gave "incredible testimony" and ordered that a forensic computer examiner be appointed to obtain computers and files showing the originating lenders of the $390 claims, and to obtain Tucker's communications, in addition to completing other tasks.

39.    On June 29, 2016, Judge Isgur ordered Tucker to file with the court a declaration as to how he prepared the document "Tucker027983". On July 8, 2016, Tucker filed a sworn declaration with the Bankruptcy Court listing the steps he took to personally prepare the spreadsheet in Kansas City, Missouri. The declaration was false, in that Tucker had another person prepare the spreadsheet and some of the information on the spreadsheet was not obtained from data in his files or electronic documents as he stated in the declaration, but was fictional.

40.    Between April 4, 2016, and July 11, 2016, Tucker caused or allowed his computer(s) at SafeLock PC to be destroyed in contravention of Judge Isgur's order that he produce all communications and documentation regarding his acquisition and transfer of the bankruptcy debt. In an attempt to distance himself from the destruction of his computers which he used to access and/or create documents for sale and for court, Tucker falsely portrayed himself to Judge Isgur as a consultant for SafeLock when in fact, he was a principal of SafeLock.

41.    Tucker testified before Judge Isgur again at a hearing October 11, 2016. Some of his false statements, identified by transcript page number, include:

a.    Q: "And are you an owner in SafeLock PC?" Tucker: "No." Q: "Have you ever had any ownership interests in SafeLock PC?" Tucker: "No." Page 16. Q: "What is your role in the company?" Tucker: "I was a consultant to the company." Page 163.

b.     Q: "were those loans ever put into any kind of master file or any master spreadsheet for somebody to be able to identify what all of those - - who those customers were that had defaulted on loans?"  Tucker:  "Yes."  Q:  "And what is that master sheet?"  Tucker:  "The 7.8 million file."  Pages 36-37.

c.     Q: "Do you have an understanding of why Castle Peak is identified as the issuer of those loans?"  Tucker:  "Yeah, that was the mask - - the masked name for the file that was sent over."  Q:  "What did Castle Peak do?"  Tucker:  "Castle Peak was a - - was a processing - - part of our processing - - I mean, more of the call center management business."  Page 101.

d.     Q: "Did you actually use real data, or did you use your guess as to the data on - - as an average?"  Tucker:  "No, we were using real data contained in there."  Page 285.

e.     Tucker:  "The 7.8 million, no.  We weren't - - we - - that was not being out marketing and sold for debt."  Page 290.

f.     Q: "Did you sell it off of that information that you had gotten from E-Data?"  Tucker:  "There - - there may have been crossover information of consumers that had multiple loans off of the data, but it wasn't going off of that data, in particularly."  Pages 291-92.

42.     Tucker also testified at the October 11, 2016, hearing that:  no documents or authority provided him with ownership of the payday loans he sold; the $390 loan amounts were not based on facts; and he had no method of determining whether he sold loans multiple times.

## COUNTS ONE - TWELVE

43.     The allegations in paragraphs One through Twenty-Four are realleged and incorporated herein by reference.

44.     On or about the dates listed below, at Kansas City, in the Western District of Missouri, and elsewhere, as a result of the scheme to sell fake debt, defendant Joel Jerome Tucker

caused to be transferred in interstate commerce between the banks listed below and Commerce Bank in Kansas City, Missouri, and elsewhere, money of a value of $5,000 or more, knowing at the time that the same had been obtained and taken by fraud, that is, money paid to purchase falsified debt portfolios which Tucker did not own, which purchases were made in reliance on the false and fraudulent material representations and omissions by defendant as set forth in paragraphs One through Twenty-Four above, the factual allegations of which are incorporated by reference as if fully set forth herein, and from which proceeds funds were disbursed, as listed below:

| Count | Dates | Amount | Wire Transmissions and Interstate Transportation of Stolen Property |
|---|---|---|---|
| Wire in | 09/16/2014 | $150,000 | Wire transfer from CHM Capital Group LLC, Bank of America acct. no. 3796, to KSQ Management LLC, Bank of the West acct. no. 2331, for "316M partial buy" |
| 1 | 09/19/2014 | $5,000 | Wire transfer from KSQ Bank of the West acct. no. 2331 to Tri-Comm, Commerce Bank acct. no. 7464 |
| Wire in | 10/10/2014 | $180,000 | Wire transfer from CHM Capital Group LLC, Bank of America acct. no. 3796, to KSQ Management LLC, Bank of the West acct. no. 2331, for "final payment Riverside Peak 3 file" |
| | 10/14/2014 | $175,000 | Wire transfer from KSQ, Bank of the West acct. no. 2331 to Graywave, Bank of the West acct. no. 7027 |
| 2 | 10/14/2014 | $16,600 | Wire transfer from Graywave, Bank of the West acct. no. 7027 to E.G., Commerce Bank acct. no. 9265 |
| 3 | 10/14/2014 | $12,800 | Wire transfer from Graywave, Bank of the West acct. no. 7027 to JSRE, Commerce Bank acct. no. 5937 |
| 4 | 10/14/2014 | $10,600 | Wire transfer from Graywave, Bank of the West acct. no. 7027 to E.G., Commerce Bank acct. no. 9265 |
| Wire in | 12/01/2014 | $100,000 | Wire transfer from Aura Development Inc., JPMorgan Chase Bank, acct. no. 0226 to Graywave, Bank of the West, acct. no. 7027 |

| 5 | 12/01/2014 | $5,000 | Wire transfer from Graywave, Bank of the West acct. no. 7027 to Tri-Comm, Commerce Bank acct. no. 7464 |
|---|---|---|---|
| 6 | 12/01/2014 | $5,000 | Wire transfer from Graywave, Bank of the West acct. no. 7027 to E.G., Commerce Bank acct. no. 9265 |
| 7 | 12/05/2014 | $10,000 | Wire transfer from Graywave, Bank of the West acct. no. 7027 to E.G., Commerce Bank acct. no. 9265 |
| 8 | 12/05/2014 | $7,000 | Wire transfer from Graywave, Bank of the West acct. no. 7027 to Tri-Comm, Commerce Bank acct. no. 7464 |
| Wire in | 12/22/2014 | $200,000 | Wire transfer from CHM Capital Group LLC, Bank of America acct. no. 3796, to Alloy Data Systems LLC, Bank of the West acct. no. 1738 |
| 9 | 12/22/2014 | $26,000 | Wire transfer from Alloy Data Systems LLC, Bank of the West acct. no. 1738 to E.G., Commerce Bank acct. no. 9265 |
| 10 | 12/22/2014 | $12,000 | Wire transfer from Alloy Data Systems LLC, Bank of the West acct. no. 1738 to JSRE LLC, Commerce Bank acct. no. 5937 |
| Wire in | 1/20/2015 | $100,000 | Wire transfer from CHM Capital Group LLC, Bank of America acct. no. 3796, to Graywave Capital Management, LLC, Centennial Bank acct. no. 8349 |
| 11 | 1/20/2015 | $13,000 | Wire transfer from Graywave Capital Management, LLC, Centennial Bank acct. no. 8349 to E.G., Commerce Bank acct. no. 9265 |
| Wire in | 1/23/2015 | $50,000 | Wire transfer from CHM Capital Group LLC, Bank of America acct. no. 3796, to Graywave Capital Management, LLC, Centennial Bank acct. no. 8349 |
| 12 | 1/28/2015 | $7,000 | Wire transfer from Graywave Capital Management, LLC, Centennial Bank acct. no. 8349 to JSRE LLC, Commerce Bank acct. no. 5937 |

All in violation of Title 18, United States Code, Section 2314.

## COUNT THIRTEEN

44.     The allegations in paragraphs One through Forty-Two are realleged and incorporated herein by reference.

45.     Between on or about June 1, 2015, through on or about February 1, 2016, in the Western District of Missouri and elsewhere, Joel Jerome Tucker, with the intent to defraud and

having devised or intending to devise a scheme or artifice to defraud the United States Bankruptcy system and for the purpose of executing such scheme or artifice, sold bankruptcy debt containing false representations either expressly or by implication, including: the identity of the lender or issuer; the amount of the loan; the amount of the finance charge; that the loan had been made; that the debtor was in default; and that Tucker had ownership of the debt. Through such actions, Tucker introduced fake debt into the United States Bankruptcy Courts for his own financial gain.

All in violation of Title 18, United States Code, Section 157.

## COUNT FOURTEEN

46. The allegations in paragraphs One through Thirty-Five and Thirty-Seven through Forty-Two are realleged and incorporated herein by reference.

47. Between on or about February 5, 2016, through on or about October 11, 2016, in the Western District of Missouri and elsewhere, Joel Jerome Tucker, with the intent to defraud and having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such scheme or artifice, made material false statements to, and violated court orders of, the United States Bankruptcy Court in the Southern District of Texas in miscellaneous case number 16-302, as detailed in paragraphs Twenty-Five through Thirty Five, and Thirty-Seven through Forty-Two of this indictment.

All in violation of Title 18, United States Code, Section 157.

## COUNT FIFTEEN

48. The allegations in paragraphs One through Forty-Two are realleged and incorporated herein by reference.

49. Between on or about March 1, 2016, and April 28, 2016, in the Western District of Missouri and elsewhere, the defendant, Joel Jerome Tucker, aided and abetted by another,

knowingly caused false entries in a record and document to be made, to wit: a spreadsheet designated "Tucker 027983" listing 26 debtors containing false information, including: that the debtor had received a loan, that a debt was owed, lender names, loan dates, and debt amounts, with the intent to impede, obstruct, and influence the investigation into the filing of false bankruptcy claims in the Southern District of Texas in Misc. Case No. 16-302, a matter that the defendant contemplated and knew was within the jurisdiction of the United States Bankruptcy Court, which is a department and agency of the United States.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## ALLEGATION OF FORFEITURE

50. By this reference the allegations contained in paragraphs One through Twenty-Four are re-alleged and incorporated for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

51. As a result of the offenses alleged in Counts One through Twelve, the defendant shall forfeit to the United States all property, real and personal, constituting, or derived from proceeds traceable to these offenses, including but not limited to the following property: a money judgment in the amount of $7,300,000 in United States currency and all interest and proceeds traceable thereto, representing the net proceeds obtained by Tucker in that at least that amount constitutes or is derived from proceeds traceable to the offense alleged in Counts One through Twelve.

52. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred, or sold to, or deposited with, a third person;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States pursuant to 21 U.S.C. § 853(p) to seek forfeiture of any other property of Tucker up to the value of the above forfeitable property.

A TRUE BILL.


_____/s/ [Deputy] Elvia M. Jones_____
FOREPERSON OF THE GRAND JURY


/s/ Kathleen D. Mahoney_____
Kathleen D. Mahoney
Assistant United States Attorney


/s/ James Curt Bohling_____
James Curt Bohling
Assistant United States Attorney


Dated: _____6/5/18_____
        Kansas City, Missouri